Pedram Esfandiary (SBN: 312569)
pesfandiary@baumhedlundlaw.com
Monique Alarcon, Esq. (SBN: 311650)
malarcon@baumhedlundlaw.com
Timothy A. Loranger, Esq. (SBN: 225422)
tloranger@baumhedlundlaw.com
**BAUM HEDLUND ARISTEI
GOLDMAN, P.C.**
10940 Wilshire Blvd., 17th Floor
Los Angeles, CA 90024
Telephone: (310) 207-3233
Facsimile: (310) 820-7444

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAMAR WEST,<br><br>      Plaintiff<br><br>  v.<br><br>CHRISTINA SHEA, Mayor of Irvine,<br><br>      Defendant. | **Case No.: 8-20-CV-01293-CJC-KES**<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:    August 24, 2020<br>Time:    1:30 P.M.<br>CTRM.: 9B<br>JUDGE: HON. CORMAC J. CARNEY |

# **TABLE OF CONTENTS**

TABLE OF CONTENTS .................................................................................................. i

**MEMORANDUM OF POINTS AND AUTHORITIES**.................................................1

I.      INTRODUCTION ................................................................................1

II.     FACTUAL BACKGROUND ...............................................................3

        A.      Facebook Pages, Profiles, and Blocking...................................3

        B.      Mayor Shea's Facebook Profiles and Pages .............................4

        C.      Plaintiff's Criticism of Mayor Shea's Views as a Public Official ....................6

III.    ARGUMENT .......................................................................................8

        A.      Plaintiff is Highly Likely to Succeed on the Merits ...............9

                1.      Mayor Shea's Facebook Profile is a Public Forum ...............9

                2.      Mayor Shea acted under Color of State Law .......................12

                3.      Mayor Shea's Blocking of Plaintiff Constitutes Viewpoint Discrimination in a Public Forum.............15

                4.      Mayor Shea's Blocking of Plaintiff Constitutes a Content-Based Restriction in a Public Forum ...............17

        B.      Plaintiff Will Suffer Irreparable Harm if a Preliminary Injunction is Not Issued ..................19

        C.      Enjoining Mayor Shea's Unconstitutional Conduct is in the Public Interest ...21

        D.      The Balance of Hardships Tips Sharply in Favor of Plaintiff ..........................21

IV.     CONCLUSION...................................................................................22

1

## <u>TABLE OF AUTHORITIES</u>

2

3                                                                                      Page(s)

4   Cases

5   *Alliance for the Wild Rockies v. Cottrell*,
6      632 F.3d 1127 (9th Cir. 2011) ..............................................................9, 20, 22
7   *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*,
8      531 U.S. 288 (2001) ...............................................................................13
9   *Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez*,
      561 U.S. 661 (2010) ..........................................................................10, 21
10  *City of Richmond*,
11     743 F. 2d 1346 (9th Cir. 1984) ...............................................................20
12  *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
13     473 U.S. 788 ..............................................................................10, 16, 18
14  *Davison v. Randall*,
      912 F.3d 666 (4th Cir. 2019) .............................................................passim
15  *Davison*,
16     267 F. Supp. 3d ...............................................................................16, 17
17  *Elrod v. Burns*,
18     427 U.S. 347 (1976) ...............................................................................20
19  *Faison v. Jones*,
      No. 19-CV-00182-TLN (KJN), 2020 WL 869122 (E.D. Cal. Feb. 21, 2020)....passim
20  *Flint v. Dennison*,
21     488 F.3d 816 (9th Cir. 2007) ..................................................................19
22  *Garnier v. Poway Unified Sch. Dist.*,
      No. 17-CV-2215-W (JLB), 2019 WL 4736208 (S.D. Cal. Sept. 26, 2019) .......passim
23  *Hopper v. City of Pasco*,
24     241 F.3d 1067 (9th Cir. 2001) .................................................................18
25  *Howerton v. Gabica*,
26     708 F.2d 380 (9th Cir. 1983) ..................................................................13
27  *Interpipe Contracting, Inc. v. Becerra*,
      898 F.3d 879 (9th Cir. 2018) ...................................................................16
28  *Int'l Soc. For Krishna Consciousness, Inc. v. Lee*,
      505 U.S. 672 (1992) ...............................................................................16

*Jackson v. Metro. Edison Co.*,
   419 U.S. 345 (1974) .................................................................................13

*Klein v. City of San Clemente*,
   584 F.3d 1196 (9th Cir. 2009) ...............................................................22

*Knight First Amendment Inst. at Columbia Univ. v. Trump*,
   928 F.3d 226 (2d Cir. 2019) .............................................................passim

*Long Beach Area Peace Network v. City of Long Beach*,
   522 F.3d 1010 (9th Cir. 2008) ...............................................................20

*Madison Joint Sch. Dist. v. Wisconsin Employment Relations Comm'n*,
   429 U.S. 167 (1976) .................................................................................19

*McIntyre v. Ohio Elections Comm'n*,
   514 U.S. 334, 115 S.Ct. 1511 (1995) .....................................................21

*Melara v. Kennedy*,
   541 F.2d 802 (9th Cir. 1976) .................................................................13

*Melendres v. Arpaio*,
   695 F.3d 990 (9th Cir. 2012) .................................................................21

*Moss v. U.S. Secret Serv.*,
   572 F.3d 962 (9th Cir. 2009) .................................................................16

*OTR Wheel Eng'g, Inc. v. West Worldwide Servs.*,
   602 Fed. Appx. 669 (9th Cir. 2015) .........................................................9

*Packingham v. North Carolina*,
   137 S. Ct. 1730 (2017)..................................................................1, 18, 19

*Paulsen v. County of Nassau*,
   925 F.2d 65 (2d Cir. 1991) ....................................................................18

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,
   460 U.S. 37 (1983) ...............................................................10, 16, 17, 18

*Pleasant Grove City, Utah v. Summum*,
   555 U.S. 460 (2009) .................................................................................17

*Reno v. American Civil Liberties Union*,
   521 U.S. 844 (1997) ...................................................................................1

*Rosenberger v. Rector & Visitors of Univ. of Virginia*,
   515 U.S. 819 (1995) .........................................................................passim

*Rossignol*,
   316 F.3d .....................................................................................................16

iii

*Roth v. United States*,
   354 U.S. 476 (1957) .......................................................................19

*Sammartano v. First Judicial Dist Ct.*,
   303 F.3d 959 (9th Cir. 2002) ........................................................21

*Shuttlesworth v. City of Birmingham, Ala.*,
   394 U.S. 147 (1969) .........................................................................9

*Sierra On-Line, Inc. v. Phoenix Software, Inc.*,
   739 F.2d 1415 (9th Cir. 1984) ......................................................22

*Skinner v. Ry. Labor Executives' Assoc.*,
   489 U.S. 602, (1989) .....................................................................13

*Sorrell v. IMS Health Inc.*,
   564 U.S. 552, (2011) .....................................................................21

*Thalheimer v. City of San Diego*,
   645 F.3d 1109 (9th Cir. 2011) ......................................................20

*Watts v. United States*,
   394 U.S. 705 (1969) .......................................................................19

*Winter v. Natural Res. Def. Counsel, Inc.*,
   555 U.S. 7 (2008) .............................................................................9

Statutes

42 U.S.C. § 1983 ..................................................................................13

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

### I.    INTRODUCTION

3        In an age where significant political discourse takes place on the internet, First

4   Amendment activity occurring online is not a novel concept for courts.  The Supreme

5   Court has recognized the role of the internet as an "expressive commodity," enabling a

6   person "to become a town crier with a voice that resonates farther than it could from

7   any soapbox."  *Reno v. American Civil Liberties Union*, 521 U.S. 844, 870 (1997).

8   Social media platforms like Facebook are regarded as "vast democratic forums of the

9   Internet"—modern public squares where Americans can debate politics, religion, and

10  other social issues, and provide "perhaps the most powerful mechanisms available to a

11  private citizen to make his or her voice heard."  *Id*. at 868; *Packingham v. North*

12  *Carolina*, 137 S. Ct. 1730, 1737 (2017).  Recently, federal courts across the country

13  have been called upon to address the constitutionality of public officials using their

14  social media platforms as public fora and subsequently "blocking" individuals from

15  their platforms who speak critically of them.

16        By way of example, the Second Circuit in *Knight First Amendment Inst. at*

17  *Columbia Univ. v. Trump*, 928 F.3d 226, 230 (2d Cir. 2019) held that President Donald

18  J. Trump engaged in viewpoint discrimination, in violation of the First Amendment, by

19  "blocking" certain Twitter users' access to his personal Twitter account, which was

20  otherwise open to the public.  The Fourth Circuit in *Davison v. Randall*, 912 F.3d 666,

21  688 (4th Cir. 2019) similarly held that the Chair of the County Board of Supervisors

22  engaged in impermissible viewpoint discrimination when she intentionally opened the

23  public comment section of her Facebook page for public discourse, and subsequently

24  "blocked" one of her constituents for publicly criticizing her.  Additionally, the

25  Southern District of California in *Garnier v. Poway Unified Sch. Dist.*, No. 17-CV-

26  2215-W (JLB), 2019 WL 4736208, at *6-10 (S.D. Cal. Sept. 26, 2019) determined that

27  school board members who "blocked" two constituents who criticized them about

28  school board matters on their Facebook campaign page were acting under color of state

law and in a designated public forum.  Most recently, and with facts substantially similar to the present case, the Eastern District of California issued a preliminary injunction requiring that the Sacramento County Sheriff "unblock" two co-leads of Black Lives Matter Sacramento from the Sheriff's Facebook page, finding that the plaintiffs had demonstrated a high likelihood of prevailing on the merits of their First Amendment claim for viewpoint discrimination.  *Faison v. Jones*, No. 19-CV-00182-TLN (KJN), 2020 WL 869122, at *11 (E.D. Cal. Feb. 21, 2020).

Much like the above cases, the Mayor of the City of Irvine, Christina Shea, utilizes her personal Facebook profile, which is freely open to the public, to interact with her constituents in her official role as mayor.  Her profile is interactive, and it provides a platform for constituents to voice their approval—or disapproval—of the mayor's and the Irvine City Council's policies and practices, and it provides an opportunity for Mayor Shea to respond.  For all intents and purposes, the mayor's Facebook profile is a public forum—hosted by a government official—subject to the First Amendment.

Notwithstanding fervent discussion within the public forum of her Facebook profile, Mayor Shea impermissibly "blocked" plaintiff Lamar West—and various other individuals—from her Facebook profile for expressing criticism of her actions as an elected official.  As a result, plaintiff has suffered a loss of his First Amendment right to engage in political speech in a public forum.  His harm is compounded by the fact that his speech has been silenced at a time when individuals nationwide are calling on elected officials to advance widespread social reform and the COVID-19 pandemic has limited many aspects of civic engagement to the internet.  The mayor's unconstitutional conduct in suppressing political speech is ongoing and will continue until plaintiff's right to access the public forum is restored by this Court.

## II.    FACTUAL BACKGROUND

### A.    Facebook Pages, Profiles, and Blocking

Facebook is an online social media platform that allows users to upload content—including text, news articles, photos, and video.  It also permits other users to respond to, comment on, and interact with others in relation to such content.  A Facebook "profile" is the home page of a Facebook account.  It is "a place on Facebook where you can share information about yourself, such as your interests, photos, videos, current city and hometown."[1]  Individuals operating a profile may elect to keep all, some, or none of its features private and can select specific populations—such as friends, family, anyone with a Facebook account or even those without an account—to view the page and its contents.  Distinct from a "profile," a Facebook "page" is a way for "[b]usinesses, organizations and public figures" to "connect with their customers or fans."[2]  However, it is common—as in the matter at bar—for a public figure to operate a profile and a page contemporaneously and to use both to connect with the broader public.

An owner of a Facebook profile or page controls its content.  They may delete posts made by other users and may "ban"—more commonly known as "block"—a user from posting on the profile or page.[3]  Relevant to the instant matter, a user who is "blocked" from a profile is prevented from viewing, commenting, posting, or otherwise contributing to the profile, and is thereby excluded from participation in the online dialogue or debate.

---

[1] *See* Facebook, What's the difference between a profile, Page, and a group?, available at https://www.facebook.com/help/337881706729661?helpref=faq_content.

[2] *See* Facebook, *About: Pages*, available at https://www.facebook.com/help/282489752085908?helpref=faq_content.

[3] See Facebook, "How do I ban or unban someone from my Page?" at https://m.facebook.com/help/185897171460026?helpref=faq_content.

**B.     Mayor Shea's Facebook Profiles and Pages**

Defendant Christina Shea ("Defendant," "mayor," or "Mayor Shea") is the Mayor of the City of Irvine, California.  Prior to becoming mayor, she served as an Irvine City councilmember.  Mayor Shea maintains two Facebook "profiles," both under the name "Christina Shea" and both cloaked in the trappings of government office.  Esfandiary Decl. ¶ 4-5, Ex. 1, 2.  In addition, Mayor Shea maintains a Facebook "page" under the name "Christina Shea, Irvine City Mayor."  Esfandiary Decl. ¶ 6, Ex. 3.

An ordinary user searching for Mayor Shea's Facebook profile would not be able to differentiate between her two profiles and page as either "official" or "personal" as the mayor posts similar government-related content across all three accounts, in varying degrees.  Her "personal" Facebook account, however—which is the subject of this action—maintains all of the characteristics of an official governmental account and Mayor Shea has used it as such since she was elected as Mayor.[4]  For purposes of this motion, the mayor's personal Facebook profile is referred to as the "personal Facebook profile", "personal profile" or "profile".

---

[4] Before filing the instant action, counsel for plaintiff attempted to resolve this issue by advising Mayor Shea of her unconstitutional conduct and asking that she immediately unblock plaintiff from her personal profile.  Esfandiary Decl. ¶ 2, Ex. 18.  Thereafter, and without responding to or unblocking plaintiff, Mayor Shea simply included a disclaimer within her "info" box on her profile stating: "Irvine resident. This is not a government page."  Esfandiary Decl. ¶¶ 2, 4, Ex. 1.  The mayor also deleted numerous posts – including the June 3 post at issue here – that had generated lively public discussion.  This after-the-fact attempt to distinguish her profile as "personal" does not change the nature of the profile as a public forum.  *See, e.g. Faison*, 2020 WL 869122, at *6 ("Defendant also repeatedly emphasizes that he labeled himself a 'Public Figure' on the page rather than a 'Government Official.'  However, Defendant cannot escape his role as a government official simply by calling himself a public figure.").  The unlawful state regulation of free speech occurs when the "posts [are] ***linked to events which arose out of*** [the state actor's] official status" regardless of how the state actor labels the public forum.  *Id.* at *7 (citing *Garnier*, 2019 WL 4736208 at *7 ("[t]he content of [the defendants'] posts, considered in totality…bore a sufficiently close nexus with the state.") (emphasis added)).

4

Mayor Shea's personal Facebook profile is viewable by the public without the need to befriend or follow the mayor on Facebook.  Esfandiary Decl. ¶ 3.  She uses her personal profile to disseminate information regarding mayoral and city council activities, to share the mayor's official position on social and political issues, and to communicate with constituents regarding a host of topics ranging from Irvine public safety to the inauguration of new parks and buildings—all with greater frequency than her official profile or page.  *See e.g.* Esfandiary Decl. ¶¶ 4-8, Ex. 1-8; Ex. 10-17.  The mayor frequently broadcasts photographs of herself engaged in official business on her personal profile.  *Id.*  For example, on March 3, 2020, the mayor posted a picture featuring herself in a meeting with officials from the Transportation Corridor Agency ("TCA") and captioned the photo as "Planning the 241/91 extension for our Toll Road customers. Working on engineering plans with TCA staff…"  Esfandiary Decl., Ex. 4.  Earlier, in December 2019, the mayor had shared several photographs of herself posing with other TCA officials on the site of a bridge construction project.  Esfandiary Decl., Ex. 5.

Through her personal Facebook profile, Mayor Shea is able to reach a wider audience to disseminate her official mayoral views and activities as compared to her other accounts.  Her personal profile has nearly 5,000 friends and 1,740 followers.  Esfandiary Decl. ¶ 4, Ex. 1.  By contrast, Mayor Shea's "official" Facebook profile has only 21 friends and her Facebook page has only 431 followers.  Esfandiary Decl. ¶ 5-6 Ex. 2; Ex. 3.

Most importantly, Mayor Shea's personal profile is interactive, and members of the public are free to "comment," "react" (by liking, disliking, or displaying other emotions), and "share" her posts.  Her profile provides a platform for constituents to voice their approval of the mayor's policies and activities, particularly those which she shares exclusively on her personal Facebook profile, but omits from her other accounts, much like the post that is at issue in this matter.

## C.     Plaintiff's Criticism of Mayor Shea's Views as a Public Official

Plaintiff Lamar West is a software engineer and resident of Irvine.  West Decl. ¶ 2.  He is a Black man who has chosen to participate in the public debate on the issues of systemic racism and ongoing police violence against Black communities.  West Decl. ¶¶ 4, 9.  On June 3, 2020, when nationwide protests surrounding the recent murders of George Floyd, Breonna Taylor, Ahmaud Arbery, and countless other Black men and women were at their most fevered pitch, Mayor Shea posted a status on her personal Facebook profile which read:

> I received several email messages today from Black Lives Matter
> By the way, we have one Council candidate maybe more, supporting and promoting this movement ...
>
> I say this because I was asked today to cut funding for our Public Safety Dept and reallocate the money to community issues such as homelessness etc
>
> We have been named one of the Safest Cities in America for 15 years in a row and I will not agree to reduce our public safety funding especially after seeing the violence we have endured as a nation this past week, If you are coming into Irvine to promote an agenda, and protest for lesser public safety protection best you turn around and find another city to compromise.

West Decl. ¶ 3, Ex. 1.  The mayor's post generated a lively discussion, receiving nearly 200 "reactions," over 150 comments, was shared over 50 times.  *Id.*  Her post, clearly discussing concerns from Irvine constituents, the City's budget, and other city councilmembers' support for the Black Lives Matter ("BLM") movement, was not shared on her official Facebook profile or her Facebook page.  Rashidi Decl. ¶ 5; Esfandiary Decl. ¶¶ 7-8.

That same day, plaintiff responded to the mayor's controversial post and criticized her official position as mayor and her policy decisions, stating: "Like other educated people have mentioned it's okay for you to support the movement and not defund the police but you don't want to do either. I can hear the racist ancestors of yours in this post and it's sickening. Enjoy your position while it last…" West Decl. ¶

6

4, Ex. 2.  Shortly thereafter, and in direct response to his critical comment, Mayor Shea blocked plaintiff from accessing her Facebook profile.  West Decl. ¶ 5.  As a result, plaintiff was unable to comment on the mayor's posts, message the profile, publish to the profile, or otherwise interact with the profile, while the rest of the general public— except others that were blocked—could.  *Id.*, ¶ 9.

Other Irvine constituents were similarly critical of Mayor Shea's position on the City's budget and her views of the Black Lives Matter movement, and they expressed critical comments on her post.  *See, e.g.*, Aminmadani Decl. ¶¶ 2, 4; Ortega Decl. ¶ 2.  Much like plaintiff, however, residents like Jessica Ortega, Nikka Aminmadani, Collin Pollum, and Mr. Pollum's sister were subsequently blocked by Mayor Shea, and like plaintiff, they remain blocked to this day.  Ortega Decl. ¶ 4-5; Aminmadani Decl. ¶¶ 3-4; West Decl. ¶ 7.

This was not an isolated instance of Mayor Shea blocking select constituents from interacting with her personal profile.  Shortly before this controversial post, on May 31, 2020, Ms. Ladan Rashidi submitted three comments on Mayor Shea's personal profile in response to the mayor's criticism of the ongoing protests against police brutality.  Rashidi Decl. ¶ 2, Ex. 1.  In turn, an individual supportive of the mayor's position replied with a hostile response toward Ms. Rashidi's comments and Mayor Shea "liked" the hostile comment.  Rashidi Decl. ¶ 3.  Subsequently, the mayor deleted all of Ms. Rashidi's comments and immediately blocked Ms. Rashidi from her profile, thereby preventing Ms. Rashidi from interacting with the public discussion.  Rashidi Decl. ¶ 4.  Mayor Shea later unblocked Ms. Rashidi, but all of Ms. Rashidi's critical comments of the mayor remain deleted to this day.  *Id.*

Moreover, on the same day (June 3) that the mayor posted the status to which plaintiff responded, the mayor also posted another status on her personal Facebook profile regarding the protests which read:

> Right now we have a huge crowd of protesters at City Hall Signs with
> very rude comments people in the street blocking traffic..[sic] received a

7

1
2

> call a resident's car was hit trying to get home by protesters in the street
> blocking traffic and we are being asked to lessen public safety?

3

West Decl. ¶ 8, Ex. 3.  Declarants Ortega and Aminmadani and constituent Pollum

4

also commented on this post prior to being blocked by the mayor.  Ortega Decl. ¶ 2;

5

Aminmadani Decl. ¶ 2; West Decl. ¶ 8.

6

Plaintiff, and those who similarly expressed critical views of Mayor Shea on her

7

official governmental role, have suffered an egregious suppression of their speech

8

regarding time-sensitive political matters, and at a time when social distancing

9

guidelines have limited many individuals to participating in online, rather than

10

traditional, public fora.  West Decl. ¶ 9; Ortega Decl. ¶¶ 5-6; Aminmadani Decl. ¶¶ 5-

11

6; Rashidi Decl. ¶ 6.  Mayor Shea cannot open up a public forum for a discussion of

12

her role as mayor, only to later shut down certain individuals' speech simply because

13

she disagrees with their viewpoint.  Her unconstitutional conduct must be enjoined.

14

## III.   ARGUMENT

15

To obtain a preliminary injunction, plaintiff "must establish [1] that he is likely

16

to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence

17

of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an

18

injunction is in the public interest." *Winter v. Natural Res. Def. Counsel, Inc.*, 555 U.S.

19

7, 22 (2008).  The Ninth Circuit employs a sliding scale test when weighing these four

20

factors.  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

21

"Under this approach, the elements of the preliminary injunction test are balanced, so

22

that a stronger showing of one element may offset a weaker showing of another." *Id.*

23

Under the "serious question" version of the sliding scale test, "a preliminary injunction

24

is appropriate when a plaintiff demonstrates … that serious questions going to the

25

merits were raised and the balance of hardships tips sharply in the plaintiff's favor." *Id.*

26

at 1134-35 (internal quotations and citations omitted).  "Serious questions need not

27

promise a certainty of success, nor even present a probability of success, but must

28

involve a 'fair chance of success on the merits.'" *OTR Wheel Eng'g, Inc. v. West Worldwide Servs.*, 602 Fed. Appx. 669, 671 (9th Cir. 2015) (citations omitted).

### A.   Plaintiff is Highly Likely to Succeed on the Merits

The political speech plaintiff has engaged in, and which he wishes to continue, is critical as "timing is of the essence in politics.  It is almost impossible to predict the political future; and when an event occurs, it is often necessary to have one's voice heard promptly, if it is to be considered at all."  *Shuttlesworth v. City of Birmingham, Ala.*, 394 U.S. 147, 163 (1969) (Justice Harlan concurring).  Mayor Shea's conduct in blocking plaintiff from her personal Facebook profile violates the First Amendment because it constitutes (1) impermissible viewpoint discrimination and (2) a content-based restriction in a designated public forum.  A likelihood of success on the merits on either of these two violations is sufficient to support the relief sought in the instant motion.

### 1.   Mayor Shea's Facebook Profile is a Public Forum

In deciding whether a space is a public forum, courts look at "the policy and practice of the government," as well as "the nature of the property and its compatibility with expressive activity" to determine the government's intent.  *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 802.  To qualify as a public forum, and thus properly be so analyzed, a space must be owned or controlled by the government. *Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez*, 561 U.S. 661, 679 (2010).  Thus, a state actor may transform an otherwise "private property, whether tangible or intangible," into a public forum by its actions.  *Davison*, *supra,* 912 F.3d at 683 (citing cases in which courts have held privately-owned property constituted a public forum).  "Opening an instrumentality of communication 'for indiscriminate use by the general public' creates a public forum." *Cornelius*, 473 U.S. at 803 (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 47 (1983)).  Further, a public forum need not be "spatial or geographic," rather "the same principles are applicable" to a "metaphysical forum." *Rosenberger v. Rector & Visitors of Univ. of*

*Virginia*, 515 U.S. 819, 830 (1995).  In evaluating this issue, courts are to "focus[] on the access sought by the speaker." Cornelius, 473 U.S. at 801.

The Ninth Circuit has not directly addressed whether, and in what circumstances, a government official's social media page constitutes a public forum. Nonetheless, the conclusions reached by other circuits and district courts within this Circuit are persuasive here.  In *Davison, supra*, 912 F.3d at 682, the Fourth Circuit concluded that the Chair of the County Board of Supervisors' Facebook page was a public forum because the Chair "intentionally opened the public comment section…for public discourse." (quoting *Cornelius*, 473 U.S. at 802).  Of importance to the court was the "interactive component" of the Chair's Facebook page and the fact that the public had unrestricted access to post on her page regarding matters of public concern. *Id.*

In *Knight*, *supra*, 928 F.3d at 237, the Second Circuit held that President Trump's Twitter account was a public forum because the account "was intentionally opened for public discussion when the President, upon assuming office, repeatedly used the account as an official vehicle for governance and made its interactive features accessible to the public without limitation."  The Second Circuit was unpersuaded by the fact that the President was utilizing his personal account—rather than his official "President of the United States" account—which he created well before his presidency and which he had personal control over.  *Id.* at 235-36.  Instead, the court recognized that President Trump's near daily use of his personal twitter account was a means by which he communicated and interacted with the public, announced "matters related to official government business," and he relied on the interactive features of the account, the "like," "retweet," and "reply" functions, to engage with and understand the public. *Id.*  Citing *Rosenberger,* 515 U.S. at 830, the court reasoned the President's "account has interactive features open to the public, making public interaction a prominent feature of this account.  These factors mean that the account is not private." *Id.* at 236.

The court in *Knight* recognized that the question of whether First Amendment scrutiny applies to a particular social media account operated by a public official is a case-specific inquiry. *Id.* As guidance, the court provided that "[t]he outcome of that inquiry will be informed by how the official describes and uses the account; to whom features of the account are made available; and how others, including government officials and agencies, regard and treat the account." *Id.*

Here, just as in *Davison* and *Knight*, Mayor Shea has utilized her personal profile to openly interact with the public about matters concerning her official role as Mayor of Irvine. Her personal profile is viewable by the public without the need to "friend" or "follow" the mayor. Esfandiary Decl. ¶ 3. Anyone with a Facebook account is free to "comment," "react" (by liking, disliking, or displaying other emotions), or "share" Mayor Shea's posts, most of which relate to her role as Mayor, including the mayor's official position on social and political issues. *Id.* For example, on January 15, 2020, the mayor posted an announcement on her profile informing the public that she "coauthored an ordinance with Councilmember Farrah Kahn to ban flavored tobacco vaping products targeted to minors. It was passed unanimously." Esfandiary Decl., Ex. 6. The post was liked by 32 people, received 5 comments from constituents, and was "shared" 3 times. *Id.* A day later, the mayor posted another update from a city council meeting, informing the public that the city approved the construction of a water park. Esfandiary Decl., Ex. 7. The post was liked by 74 people and received 12 comments from constituents. *Id.*

Moreover, the mayor often posts photos with captions of herself engaged in official business. Esfandiary Decl., Ex. 4-5, 10-11. Members of the public regularly comment on her posts regarding her service to the community and Mayor Shea often interacts with her constituents by replying to their comments. Esfandiary Decl., Ex. 8. Mayor Shea retains control over her personal Facebook profile, including the ability to ban members of the public, as she did with plaintiff. Esfandiary Decl., Ex. 9. The mayor has applied no limitations on public access, and the interactive component of

the profile is widely used, both by constituents commenting on issues of public concern, and by the mayor herself.

Indeed, in the post that is at the heart of this controversy, Mayor Shea posted about the City's budget and her Mayoral position on constituents' calls to reduce funding for law enforcement and instead reallocate resources to the community.  West Decl., Ex. 1.  The post, created on June 3, 2020, generated a lively and heated discussion involving several hundred people—including the mayor—over the ensuing days.  Notably, this post was not shared on her official profile or her Facebook page. Rashidi Decl. ¶ 5; Esfandiary Decl. ¶¶ 7-8.   In fact, Mayor Shea had not posted on her Facebook page (titled "Christina Shea, Irvine City Mayor") from April 29 through June 4, 2020; nor had she posted on her official Facebook profile from May 31 through June 4, 2020.  *Id.*

Mayor Shea's use of her personal profile to communicate her position on such matters of social import and policies regarding the Irvine City budget makes it clear that she views the profile as a government account.  She has "clothed her [profile] in the trappings of her public office."  *Davison*, 912 F.3d at 683.  Under these facts and the governing law, Mayor Shea's personal Facebook profile constitutes a public forum.

## 2.  Mayor Shea acted under Color of State Law

By satisfying the "governmental control-or-ownership" prong of the test above, plaintiff has also established that Mayor Shea acted "under color of state law" for purposes of 42 U.S.C. § 1983.  Because Mayor Shea "as we have seen, acts in an official capacity when [she posts] … [she] acts in the same capacity when [she] blocks those who disagree with [her]."  *Knight*, 928 F.3d at 236.

There is no single formula for determining state action.  *Melara v. Kennedy*, 541 F.2d 802, 805 (9th Cir. 1976).  Rather, the analysis "is a matter of normative judgment, and the criteria lack rigid simplicity."  *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001).  Courts consider the totality of the circumstances when determining whether the challenged conduct amounts to state

action.  *Skinner v. Ry. Labor Executives' Assoc.*, 489 U.S. 602, 614–15, (1989); *Howerton v. Gabica*, 708 F.2d 380, 384 (9th Cir. 1983).  Ultimately, there must be "sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974); *see also Garnier, supra*, 2019 WL 4736208, at *6.

The Ninth Circuit has not addressed the issue of a whether a public official blocking an individual on social media constitutes state action.  "In the context of an alleged First Amendment violation, in particular, [the Fourth Circuit] has found that a challenged action by a governmental official is fairly attributable to the state when the sole intention of the official in taking the action was to suppress speech critical of his conduct of official duties or fitness for public office."  *Davison*, 912 F.3d at 680 (internal quotations and citations omitted).

In *Davison*, the court held that the Chair of the Board of Supervisors was acting under color of state law when she blocked citizens from her Facebook page, finding that the Chair used her Facebook page to share information with the public about her official activities, including sharing information about public events, and often sought input from the public about policy issues.  912 F.3d at 680-81.  Importantly, the court emphasized that the Chair blocked plaintiff after he submitted a critical comment on her post concerning her official duties.  *Id.* at 680.  Similarly, in *Knight*, the court determined that President Trump acted in his governmental capacity, not as a private citizen, when he blocked certain Twitter uses from interacting with this Twitter account.  928 F.3d at 236.  The court reasoned that the President's account included photographs of himself engaged in the performance of his official duties, such as meeting with other public officials.  *Id*. at 231.  The President used the account to announce official decisions and to describe and defend his official policies.  *Id*. at 231.

Moreover, the court in *Garnier* held that the school board members' public Facebook pages, which were originally created for campaigning, nevertheless

demonstrated that they were acting under color of state law when they blocked the plaintiffs from interacting with their page. *Garnier*, 2019 WL 4736208, at \*7. The court reasoned that the Facebook pages were used to disseminate official school board information and the defendant's posts were related to events arising out of their official role as school board members. *Id.* Finally, in *Faison*, *supra*, 2020 WL 869122, at \*6, the court concluded that the defendant-sheriff acted under color of state law while administering his Facebook page, such that there was a sufficiently close nexus with the state. *Id.* The court recognized that the sheriff often posted about his official role in overseeing the Sheriff's Department and importantly, the plaintiffs' claims arose from critical comments they made regarding the defendant in his official role as sheriff. *Id.* It made no difference to the court that the defendant's Facebook page identified him as a "Public Figure" rather than a "Government Official." *Id.*

Here, the totality of the circumstances demonstrates that Mayor Shea's administration of her personal Facebook profile amounts to state action. Although Mayor Shea maintains a Facebook page and two profiles, in practice, Mayor Shea has been more active and has engaged a larger part of her constituency through her personal Facebook profile. Her personal profile contains photographs of her while performing her official duties as Mayor, as well as photos with other elected officials, which the public is free to comment on. Esfandiary Decl., Ex. 4; Ex. 5; Ex. 8. Other posts include photographs of the mayor receiving constituents at City Hall (when she was still serving as a city councilmember), live updates from local governmental and agency meetings, representing Irvine as a delegate at regional political functions, data regarding the City's financial state, information regarding the mayor's swearing-in ceremony, and presiding over the opening of new public spaces. Esfandiary Decl., Ex. 10-17. Mayor Shea uses her profile to convey messages directly related to the mayor's official functions. Esfandiary Decl., Ex. 6-7.

Importantly, on June 3, 2020, Mayor Shea blocked plaintiff from her personal profile when he was critical of her official Mayoral views on the City's budget and

another councilmembers support for the Black Lives Matter movement.  West Decl., Ex. 1.  At least four other individuals who were critical of the mayor's official views expressed in her posts were similarly blocked after publicly commenting on her posts.  *See* Rashidi Decl. ¶¶ 2-4, Ex. 1; Ortega Decl. ¶¶ 2-4; Aminmadani Decl. ¶¶2-3; West Decl. ¶¶ 7-8.  As in *Davison* and *Garnier*, this provides further evidence that Mayor Shea was acting under color of state law.  The June 3 post concerning the City's budget did not appear on the mayor's other Facebook profile nor her Facebook page.  Rashidi Decl. ¶ 5; Esfandiary Decl. ¶¶ 7-8.  Accordingly, the content of Mayor Shea's posts, considered in the totality, bears a sufficiently close nexus with the state, such that her posts are attributable to state action.

### 3. Mayor Shea's Blocking of Plaintiff Constitutes Viewpoint Discrimination in a Public Forum

Having established that the Mayor Shea personal Facebook profile is indeed a public forum, plaintiff need only demonstrate that his speech was suppressed on the basis of his viewpoint.  Viewpoint discrimination is prohibited in all forums.  *Int'l Soc. For Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 679 (1992).  "Viewpoint discrimination is . . . an egregious form of content discrimination" whereby "the government targets not subject matter, but particular views taken by speakers on a subject[.]" *Rosenberger*, 515 U.S. at 829.  It "occurs when the government prohibits speech by particular speakers, thereby suppressing a particular view about a subject." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 970 (9th Cir. 2009) (quotations omitted).  It is "the most noxious form of speech suppression," *Interpipe Contracting, Inc. v. Becerra*, 898 F.3d 879, 899 (9th Cir. 2018), and thus prohibited in every type of forum.  *See Perry*, 460 U.S. at 64 ("Regardless of the nature of the forum, the critical inquiry is whether the Board has engaged in prohibited viewpoint discrimination.").  And it is present whenever an official action restricting speech is "impermissibly motivated by a desire to suppress a particular point of view." *Cornelius*, 473 U.S. at 812-13.

Thus, in a case where sheriff's deputies seized issues of a newspaper critical of a sheriff's performance of his duties, the court found they had engaged in viewpoint discrimination. *Rossignol*, 316 F.3d at 521. Similarly, in *Knight*, the court found that President Trump engaged in viewpoint discrimination by blocking Twitter users who interacted with his account by "expressing viewpoints he found distasteful." 928 F.3d at 239-40. And, as noted above, the *Davison* court found viewpoint discrimination where a county official banned a vocal critic of government from her Facebook page. *Davison*, 267 F. Supp. 3d at 716. Likewise, in *Faison* the Honorable Troy L. Nunley held that the Sheriff of Sacramento engaged in viewpoint discrimination when it was "abundantly clear that Defendant strongly disagrees with [Black Lives Matter's] viewpoints on the topic of Department oversight…[and] Defendant banned [plaintiff] after she commented on a post related to Defendant's resistance to oversight, in which Defendant expressly criticized BLM." 2020 WL 869122 at *8.

Here, plaintiff is unable to speak out about the mayor's official policies, while people who express support for Mayor Shea can. West Decl. ¶¶ 6, 9. Mayor Shea's conduct makes clear that she strongly disagrees with the calls for structural change to policing and the Black Lives Matter movement, and it is clear that she will not tolerate viewpoints that are critical of her official mayoral position on these political issues. Ortega Decl. ¶¶ 2, 5; Rashidi Decl. ¶¶ 2-4; Aminmadani Decl. ¶¶ 2-3.

Plaintiff was blocked simply for expressing his view that the mayor's decision and position were misplaced and carried racial undertones with which plaintiff disagreed. West Decl. ¶ 4. The experiences of other constituents who were blocked, such as Ms. Ortega, Ms. Aminmadani, Mr. Pollum, and Mr. Pollum's sister, further exemplify the discriminatory actions of Mayor Shea. Ortega Decl. ¶ 4-5; Aminmadani Decl. ¶¶ 3-4; West Decl. ¶ 7-8. Mayor Shea has undoubtedly engaged in the "suppression of critical commentary regarding elected officials. . . the quintessential form of viewpoint discrimination against which the First Amendment guards." *Davison*, 267 F. Supp. 3d at 717. Discriminating against and silencing speech that

expresses a particular viewpoint is strictly prohibited by the First Amendment.
Plaintiff has a high likelihood of succeeding on the merits of his First Amendment
claim based on viewpoint discrimination.

### 4. Mayor Shea's Blocking of Plaintiff Constitutes a Content-Based Restriction in a Public Forum

Government officials are "strictly limited" in their ability to regulate private
speech in public fora. *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 469
(2009). Once a space is determined to be a public forum, the next step involves
classifying it by type. Traditional public forums are spaces, such as streets and parks,
that "by long tradition … have been devoted to assembly and debate." *Perry
Education Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). "A second
category consists of public property which the State has opened for use by the public
as a place for expressive activity." *Id*. The government creates such a forum by
"intentionally opening a nontraditional forum for public discourse." *Cornelius*, 473
U.S. at 802. "Restrictions on expressive activity in designated public fora are subject
to the same limitations that govern a traditional public forum, i.e., strict scrutiny."
*Hopper v. City of Pasco*, 241 F.3d 1067, 1074 (9th Cir. 2001) (quotations omitted).

Determining governmental intent to create a designated public forum involves
more than simply evaluating its stated purpose. Intent "must be inferred from a
number of objective factors including: [the government's] policy and past practice, as
well as the nature of the property and its compatibility with expressive activity."
*Paulsen v. County of Nassau*, 925 F.2d 65, 69 (2d Cir. 1991) (citing *Cornelius*, 473
U.S. at 802-03). In *Garnier*, the court found that the interactive portions of the
defendants' Facebook pages constituted designated public forums, given that the
nature of the Facebook pages was consistent with expressive activity. 2019 WL
4736208, at *10. The court reasoned that the defendants intended to create a public
forum where people could speak, and there were no limits on who could do so and
what topics could be addressed, until someone was blocked by defendants. *Id.*

1
2
3
4
5
6
7
8
9
10
11
12
13

Under the principles set forth in *Cornelius*, and just as in *Garnier*, it is clear that Mayor Shea intentionally created a designated public forum by leaving her personal Facebook profile accessible to the public who could freely interact with the official government content she shared therein. The mayor's profile was open to her extensive "friends" and "followers" and any member of the public who was not blocked from her profile. *See* Esfandiary Decl. ¶ 3. As demonstrated above, Mayor Shea frequently utilizes her profile to participate in dialogue with her constituents. And, it is eminently compatible with expressive activity. *See Packingham*, 137 S. Ct. at 1735, 1737 (describing internet in general, and social media in particular, as "the most important places. . . for the exchange of views," as the latter "can provide perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard," in part, because these platforms permit citizens to petition their elected officials "and otherwise engage with them in a direct manner").

14
15
16
17
18
19
20

Because Mayor Shea's profile is a designated public forum, any content-based restrictions are "subject to strict scrutiny, requiring [Mayor Shea] to show a compelling interest in the restriction that is drawn narrowly to meet the interest." *Flint v. Dennison*, 488 F.3d 816, 830 (9th Cir. 2007). If Mayor Shea fails to demonstrate a compelling state interest in restricting plaintiff's speech and fails to prove that such restriction is narrowly tailored to meet that interest, Mayor Shea's conduct in blocking plaintiff violates the First Amendment. *Id.*

21
22
23
24
25
26
27
28

Mayor Shea is unable to meet her burden. There can be no rational justification for silencing plaintiff's speech which was critical of the mayor's position on the City's budget and her official views on the Black Lives Matter movement. And whatever interest might be conjured under these circumstances, a wholesale banning of them from "the most important place[]…for the exchange of views," *Packingham*, 137 S. Ct. at 1735, cannot be deemed as narrowly drawn to meet that interest. After all, "[w]here the State has opened a forum for direct citizen involvement, it is difficult to find justification for excluding …[those] who are most vitally concerned with the

proceedings." *Madison Joint Sch. Dist. v. Wisconsin Employment Relations Comm'n*, 429 U.S. 167, 175 (1976). Giving substance to a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open," *Watts v. United States*, 394 U.S. 705, 708 (1969), the First Amendment assures the "unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Roth v. United States*, 354 U.S. 476, 484 (1957). Thus, any purported compelling interest that Mayor Shea could proffer would not be narrowly tailored by suppressing plaintiff's speech. Mayor Shea's conduct fails to satisfy the most exacting scrutiny required by the First Amendment.

**B.     Plaintiff Will Suffer Irreparable Harm if a Preliminary Injunction is Not Issued**

Because plaintiff has clearly carried his burden of establishing a likelihood of success on the merits, the Ninth Circuit's sliding scale test requires that a preliminary injunction issue, so long as plaintiff meets the minimum requirements for a preliminary injunction. *See Alliance for the Wild Rockies*, 632 F.3d at 1135.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976); *see also Thalheimer v. City of San Diego*, 645 F.3d 1109, 1116 (9th Cir. 2011) (loss of First Amendment rights "unquestionably constitutes irreparable injury"). Such harm is all the more irreparable where, as here, a plaintiff seeks to engage in political speech, as "[t]iming is of the essence in politics." *Long Beach Area Peace Network v. City of Long Beach*, 522 F.3d 1010, 1020 (9th Cir. 2008) (*quoting NAACP. v. City of Richmond*, 743 F. 2d 1346, 1356 (9th Cir. 1984)).

Here, plaintiff has been excluded from Mayor Shea's personal Facebook profile during a critical and time-sensitive period where the murder of Black individuals by law enforcement has ignited a nationwide call for widespread reform. "Black Lives Matter" is at the forefront of this call for change and as demonstrated by Mayor Shea's post, she is critical of councilmembers and constituents who support the Black Lives

Matter movement and calls to reallocate the City's budget to reflect the reform sought by BLM.  West Decl. ¶¶ 3, 4, 9.  Since commenting on the mayor's controversial post from June 3, 2020, plaintiff has been blocked from Mayor Shea's personal profile.  *Id.* ¶ 6.  Thus, plaintiff is unable to read and respond to her official Mayoral policies on time-sensitive social and political issues, nor is he able to participate in the conversation between other constituents that occurs on the mayor's profile concerning these issues which the mayor posts about.

Plaintiff's harm is in no way mitigated by the fact that he might be able to "speak" or post a message elsewhere, including on the Mayor's Facebook page or other Facebook profile.  As the court explained in *Knight*, the fact that "[plaintiff] retain[s] some ability to 'work around' the blocking does not cure the constitutional violation.  Neither does the fact that [plaintiff] can post messages elsewhere."  928 F.3d at 238.  Such a burden on plaintiff's speech runs afoul of the First Amendment. *Faison*, 2020 WL 869122, at *9; *citing Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566, (2011); *Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 690, (2010) ("When the government has discriminated against a speaker based on the speaker's viewpoint, the ability to engage in other speech does not cure that constitutional shortcoming.")

In fact, plaintiff's harm is compounded given the fact that Mayor Shea's block prevents plaintiff from engaging in political speech amidst an ongoing controversy. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346–47, 115 S.Ct. 1511 (1995) (emphasizing that discussion of public issues and criticism of public officials "occupies the core of the protection afforded by the First Amendment").  This is particularly true when online platforms, like Facebook, serve as an essential tool for ensuring elected officials hear the demands and concerns of the people while current social distancing guidelines are in place.  West Decl. ¶ 9.

**C.      Enjoining Mayor Shea's Unconstitutional Conduct is in the Public Interest**

"[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). Courts "have consistently recognized the significant public interest in upholding First Amendment principles." *Sammartano v. First Judicial Dist Ct*., 303 F.3d 959, 974 (9th Cir. 2002). "The public interest inquiry primarily addresses impact on non-parties rather than parties." *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002). The Ninth Circuit has "consistently recognized the significant public interested in upholding free speech principles as the ongoing enforcement of the potentially unconstitutional regulations … would infringe not only the free expression interests of [plaintiff], but also the interests of other people subjected to the same restrictions." *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009).

Here, requiring that Mayor Shea unblock plaintiff from accessing her personal Facebook profile, and enjoining her from blocking or otherwise limiting the access of plaintiff and other individuals on the basis of their viewpoint and on the content of their speech, is in the public interest. Enjoining Mayor Shea in this manner would not restrict her ability to speak in any way. Mayor Shea retains full control over her profile, and as of the filing of the instant motion, her profile remains accessible to the general public who is free to interact with her profile whenever she posts any content. For these reasons, it is in the public interest to enjoin Mayor Shea from continuing to block plaintiff and others from her profile.

**D.      The Balance of Hardships Tips Sharply in Favor of Plaintiff**

The balance of hardships tips in favor of plaintiff and the injunction he seeks. Granting the preliminary injunction will ensure that, during the pendency of this litigation, plaintiff will not suffer further curtailment of his First Amendment rights. In contrast, there is no evidence of hardship that Mayor Shea will suffer if she restores plaintiff's rights to participate in the forum of viewpoints she has created. To the

extent the mayor or others disagree with comments made by plaintiff, and other individuals like Ms. Ortega; Ms. Aminmadani; Ms. Rashidi; and Mr. Pollum, the solution is to engage debate, counterpoint, and commentary.

Indeed, the balance not only tips in favor of plaintiff, it does so sharply and decidedly.  Where there is a sharp tipping of the hardship balance in plaintiff's favor (along with a showing of irreparable injury and public interest), plaintiff is entitled to preliminary injunction simply if there are "serious questions going to the merits." *Alliance*, *supra*, 632 F.3d at 1135 (reversing denial of preliminary injunction because district court's failure to apply the "serious questions" test was "an error of law"); *see, e.g., Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422-23 (9th Cir. 1984) (preliminary injunction affirmed because plaintiff had a fair chance of success in proving the merits of its claims and the balance of harms tipped decidedly in plaintiff's favor); *Faison*, 2020 WL 869122, at *10-11 (finding that the harm to the plaintiffs in not being able to participate in the public discourse occurring on the sheriff's Facebook page was greater than any hardship to the sheriff and granting the plaintiffs' preliminary injunction).  Accordingly, this Court should find that the balance of hardships tips sharply in plaintiff's favor and enjoin Mayor Shea's unconstitutional conduct.

## IV.   CONCLUSION

Plaintiff is likely to succeed on the merits, has demonstrated the likelihood of irreparable injury, a public interest supporting an injunction, and a balance of hardships that tips in his favor.  For these reasons, a preliminary injunction should be issued directing Mayor Shea to return plaintiff to the "unblocked" status he previously enjoyed, refrain from blocking plaintiff and other individuals on the basis of their protected political speech, and take no further action restricting plaintiff from engaging in the public forum (such as by deleting his comments) while the litigation proceeds.

Respectfully submitted,

Dated:  July 22, 2020      **BAUM HEDLUND ARISTEI GOLDMAN, P.C.**

By:  /s/ Pedram Esfandiary
Pedram Esfandiary, Esq.
pesfandiary@baumhedlundlaw.com
Monique Alarcon, Esq.
malarcon@baumhedlundlaw.com
Timothy A. Loranger, Esq.
tloranger@baumhedlundlaw.com
**BAUM, HEDLUND, ARISTEI, GOLDMAN, P.C.**
10940 Wilshire Boulevard, 17th Floor
Los Angeles, CA 90024
Telephone: (310) 207-3233

*Attorneys for Plaintiff*

23